1

2

3

4

5

6

7

8         **UNITED STATES DISTRICT COURT**

9         **EASTERN DISTRICT OF CALIFORNIA**

10

11   KIRK MONROE DAVIS,                     )   Case No.: 1:12-cv-00266-LJO-JLT
                                            )
12            Petitioner,                   )   FINDINGS AND RECOMMENDATIONS RE:
                                            )   RESPONDENT'S MOTION TO DISMISS (Doc. 21)
13        v.                                )
                                            )   ORDER DIRECTING OBJECTIONS TO BE FILED
14   P. D. BRAZELTON,                       )   WITHIN TWENTY DAYS
                                            )
15            Respondent.                   )
                                            )
16   _____   )

17            Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.

19                              **PROCEDURAL HISTORY**

20            On February 22, 2012, Petitioner filed the instant petition, challenging his 2001 conviction for

21   possession of a billy club, for which Petitioner was sentenced under California's Three Strikes Law,

22   using a 1978 conviction for rape and burglary as an enhancement.[1]  On April 19, 2012, Petitioner filed

23   a separate federal petition in case no. 1:12-cv-00625-JLT, challenging Petitioner's 1978 conviction.

24

25   _____

     [1] In Houston v. Lack, the United States Supreme Court held that a pro se habeas petitioner's notice of appeal is deemed
26   filed on the date of its submission to prison authorities for mailing, as opposed to the actual date of its receipt by the court
     clerk.  Houston v. Lack, 487 U.S. 166, 276, 108 S.Ct. 2379, 2385 (1988).  The rule is premised on the pro se prisoner's
27   mailing of legal documents through the conduit of "prison authorities whom he cannot control and whose interests might
     be adverse to his."  Miller v. Sumner, 921 F.2d 202, 203 (9th Cir. 1990); see Houston, 487 U.S. at 271. The Ninth Circuit
28   has applied the "mailbox rule" to state and federal petitions in order to calculate the tolling provisions of the AEDPA.
     Saffold v. Neland, 250 F.3d 1262, 1268-1269 (9th Cir. 2000); Stillman v. LaMarque, 319 F.3d 1199, 1201 (9th Cir. 2003).

                                                1

1   On March 1, 2012, the Court ordered Respondent to file a response to the petition in case no. 1:12-cv-

2   00266-LJO-JLT within sixty days.  (Doc. 9).  On April 26, 2012, Petitioner filed a motion to amend

3   the instant petition or, alternatively, to supplement the petition with the claims raised in case no. 1:12-

4   cv-00625-JLT.  (Doc. 15).  Petitioner filed an identical motion in the later-filed case, making the

5   identical request.  On April 30, 2012, Respondent filed a statement of non-opposition to the motion to

6   amend and/or supplement pleadings.  (Doc. 16).  On May 4, 2012, the Court granted Petitioner's

7   motion to supplement or amend the pleadings in this case with those raised in case no. 1:12-cv-00625-

8   JLT, and ordered Respondent to file a response within sixty days.  (Doc. 17).

9        On September 10, 2012, Respondent, in lieu of an answer, filed the instant motion to dismiss

10  the petition, as supplemented by the May 4, 2012 order, as untimely.  (Doc. 21).  Respondent also

11  contended that various claims were unexhausted and that many failed to state cognizable federal habeas

12  claims.  On November 7, 2012, Petitioner filed an opposition to Respondent's motion to dismiss.  (Doc.

13  27).  On December 24, 2012, Respondent filed a reply to Petitioner's opposition.  (Doc. 33). Thereafter,

14  Petitioner filed yet another document, styled as a "Motion To Allow Response To Reply To Opposition

15  To Dismiss," directed to Respondent's reply.  (Doc. 36).[2]  Then, on January 27, 2013, apparently not

16  satisfied with having the last word, Petitioner's counsel fired yet another salvo, arguing that the petition

17  should be deemed timely.  (Doc. 39).  No further volleys having been fired since January 27, 2013;

18  accordingly, the Court will now address the merits of the instant motion to dismiss.

19                                    **DISCUSSION**

20       A.  Procedural Grounds for Motion to Dismiss

21            As mentioned, Respondent has filed a Motion to Dismiss the petition as being filed outside the

22  one year limitations period prescribed by Title 28 U.S.C. § 2244(d)(1).  Rule 4 of the Rules Governing

---

24  The date the petition is signed may be considered the earliest possible date an inmate could submit his petition to prison
authorities for filing under the mailbox rule.  Jenkins v. Johnson, 330 F.3d 1146, 1149 n. 2 (9th Cir. 2003).  However, in

25  this case, Petitioner was proceeding through counsel, not in propria persona, and, accordingly, the "mailbox" rule does not
apply.  Therefore, the Court will use the actual date counsel for Petitioner filed the instant petition, i.e., February 22, 2012.

26  [2] The Clerk of the Court did not file this document as an active motion on the Court's docket, and the Court has never
considered it as such.  However, to the extent that administrative concerns require disposition of Petitioner's request to add

27  this document's legal arguments to the mountain of argument already deposited with the Clerk of the Court, the Court
grants that motion.  The Court will, and has, considered the arguments contained therein before reaching the conclusions

28  contained in this Findings and Recommendations.

Section 2254 Cases allows a district court to dismiss a petition if it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court . . . ." Rule 4 of the Rules Governing Section 2254 Cases.

The Ninth Circuit has allowed Respondent's to file a Motion to Dismiss in lieu of an Answer if the motion attacks the pleadings for failing to exhaust state remedies or being in violation of the state's procedural rules. See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990) (using Rule 4 to evaluate motion to dismiss petition for failure to exhaust state remedies); White v. Lewis, 874 F.2d 599, 602-03 (9th Cir. 1989) (using Rule 4 as procedural grounds to review motion to dismiss for state procedural default); Hillery v. Pulley, 533 F.Supp. 1189, 1194 & n.12 (E.D. Cal. 1982) (same). Thus, a Respondent can file a Motion to Dismiss after the court orders a response, and the Court should use Rule 4 standards to review the motion. See Hillery, 533 F. Supp. at 1194 & n. 12.

In this case, Respondent's Motion to Dismiss is based on a violation of 28 U.S.C. 2244(d)(1)'s one year limitation period and Respondent's contention that various claims in the combined petition fail to state cognizable habeas claims and that many of the claims are unexhausted. Because Respondent's Motion to Dismiss is similar in procedural standing to a Motion to Dismiss for failure to exhaust state remedies or for state procedural default and Respondent has not yet filed a formal Answer, the Court will review Respondent's Motion to Dismiss pursuant to its authority under Rule 4.

B.  Limitation Period For Filing Petition For Writ Of Habeas Corpus

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA imposes various requirements on all petitions for writ of habeas corpus filed after the date of its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc), *cert. denied,* 118 S.Ct. 586 (1997). The instant petition was filed on February 22, 2012, and thus, it is subject to the provisions of the AEDPA.

The AEDPA imposes a one year period of limitation on petitioners seeking to file a federal petition for writ of  habeas corpus. 28 U.S.C. § 2244(d)(1). As amended, § 2244, subdivision (d) reads:

(1)  A 1-year period of limitation shall apply to an application for a writ of habeas

3

corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

In most cases, the limitation period begins running on the date the petitioner's direct review became final.  Here, Petitioner was convicted on August 20, 2001.   Petitioner commenced his direct appeal, which concluded when the petition for review filed with the California Supreme Court was denied on October 15, 2003.   (Doc. 38, Lodged Documents ("LD") 3, 4).  Thus, direct review would have concluded on January 13, 2004, when the ninety-day period for seeking review in the United States Supreme Court expired.  Barefoot v. Estelle, 463 U.S. 880, 887 (1983); Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir.1999); Smith v. Bowersox, 159 F.3d 345, 347 (8th Cir.1998).  Petitioner would then have one year from the following day, January 14, 2004, or until January 13, 2005 absent applicable tolling, within which to file his federal petition for writ of habeas corpus.

As mentioned, the instant petition was filed on February 22, 2012, over seven years after the date the one-year period would have expired.  Thus, unless Petitioner is entitled to either statutory or equitable tolling sufficient to account for that span of time, the instant petition is untimely and should be dismissed.[3]

---

[3] Petitioner repeatedly excoriates Respondent for failing to address the merits of Petitioner's claims that his 2001 conviction and the prior convictions were infected with unconstitutional errors. (E.g., Doc. 36, p. 3).  Petitioner characterizes Respondent's arguments as "side-stepping" the primary issues.  (Id.).  Petitioner is incorrect.  It would be

1        C.   <u>Tolling of the Limitation Period Pursuant to 28 U.S.C. § 2244(d)(2)</u>

2        Under the AEDPA, the statute of limitations is tolled during the time that a properly filed

3 application for state post-conviction or other collateral review is pending in state court. 28 U.S.C. §

4 2244(d)(2). A properly filed application is one that complies with the applicable laws and rules

5 governing filings, including the form of the application and time limitations. <u>Artuz v. Bennett</u>, 531

6 U.S. 4, 8, 121 S. Ct. 361 (2000). An application is pending during the time that 'a California

7 petitioner completes a full round of [state] collateral review," so long as there is no unreasonable delay

8 in the intervals between a lower court decision and the filing of a petition in a higher court.

9 <u>Delhomme v. Ramirez</u>, 340 F. 3d 817, 819 (9th Cir. 2003), <u>abrogated on other grounds as recognized</u>

10 <u>by Waldrip v. Hall</u>, 548 F. 3d 729 (9th Cir. 2008)(per curium)(internal quotation marks and citations

11 omitted); <u>see</u> <u>Evans v. Chavis</u>,  546 U.S. 189, 193-194, 126 S. Ct. 846 (2006); <u>see</u> <u>Carey v. Saffold</u>,

12 536 U.S. 214, 220, 222-226, 122 S. Ct. 2134 (2002); <u>see</u> <u>also</u>, <u>Nino v. Galaza</u>, 183 F.3d 1003, 1006

13 (9th Cir. 1999).

14        Nevertheless, there are circumstances and periods of time when no statutory tolling is allowed.

15 For example, no statutory tolling is allowed for the period of time between finality of an appeal and the

16 filing of an application for post-conviction or other collateral review in state court, because no state

17 court application is "pending" during that time. <u>Nino</u>, 183 F.3d at 1006-1007; <u>Raspberry v. Garcia</u>, 448

18 F.3d 1150, 1153 n. 1 (9th Cir. 2006). Similarly, no statutory tolling is allowed for the period between

19 finality of an appeal and the filing of a federal petition. <u>Id.</u> at 1007.  In addition, the limitation period

20 is not tolled during the time that a federal habeas petition is pending. <u>Duncan v. Walker</u>, 563 U.S. 167,

21 181-182, 121 S.Ct. 2120 (2001); <u>see</u> <u>also</u>, <u>Fail v. Hubbard</u>, 315 F. 3d 1059, 1060 (9th Cir. 2001)(as

22 amended on December 16, 2002). Further, a petitioner is not entitled to statutory tolling where the

23 limitation period has already run prior to filing a state habeas petition. <u>Ferguson v. Palmateer</u>, 321 F.3d

24

---

25 entirely inappropriate to address the merits of <u>any</u> of Petitioner's claims at this juncture in the proceedings because the **only**

26 matter now before the Court is the motion to dismiss the petition, and therefore the **only** issue for the Court to address at this juncture is timeliness as defined by the AEDPA and the federal jurisprudence interpreting § 2244. Issues such as actual

27 innocence and ineffective assistance of counsel, both raised as substantive merits claims in the petition, are relevant to the motion to dismiss only insofar as both, under the appropriate circumstances, may be used as bases for equitable tolling.

28 Hence, to the extent necessary, such issues will be addressed herein within the narrow context of equitable tolling.  They will not, and cannot, be addressed at this juncture on their merits.

1   820, 823 (9th Cir. 2003) ("section 2244(d) does not permit the reinitiation of the limitations period that

2   has ended before the state petition was filed."); <u>Jiminez v. White</u>, 276 F. 3d 478, 482 (9th Cir. 2001).

3   Finally, a petitioner is not entitled to continuous tolling when the petitioner's later petition raises

4   unrelated claims.  <u>See</u> <u>Gaston v. Palmer</u>, 447 F.3d 1165, 1166 (9th Cir. 2006).

5         Here, the record now before the Court indicates that Petitioner filed the following state habeas

6   petitions: (1) habeas petition filed in the California Court of Appeal, 5th Appellate District ("5th DCA")

7   on July 29, 2004, and denied on September 23, 2004 (LD 5, 6);[1] (2) habeas petition filed in the

8   Superior Court of Tulare County on October 5, 2004, and denied on October 13, 2004 (LD 7, 8); (3)

9   habeas petition filed in the 5th DCA on November 15, 2004, and denied on September 15, 2005 (LD 9,

10  10); (4) habeas petition filed in the Tulare County Superior Court on September 26, 2005, and denied

11  on October 4, 2005 (LD 11, 12); (5) habeas petition filed in the 5th DCA on October 11, 2005, and

12  remanded to the superior court on June 21, 2006 (LD 13, 14); (6) habeas petition denied by the Tulare

13  County Superior Court April 5, 2007, following remand from the 5th DCA (LD 15);[4] (7) habeas petition

14  filed in the Tulare County Superior Court on May 7, 2008, and denied on May 19, 2009 (LD 17, 18);

15  (8) habeas petition filed in the Tulare County Superior Court on November 9, 2009, and denied on

16  November 13, 2009 (LD 18, 19); (9) habeas petition filed in the 5th DCA on February 22, 2010, and

17  denied on August 9, 2011 (LD 20, 21); (10) petition for coram nobis filed in the Tulare County

18  Superior Court on June 18, 2010, and denied on July 2, 2010 (LD 22, 23); (11) petition for coram nobis

19  filed in the 5th DCA on December 20, 2010, and denied on August 9, 2011 (LD 24, 25); (12) petition

20  for review filed in the California Supreme Court on August 17, 2011, and denied on October 19, 2011

21  (LD 26, 27); (13) petition for review filed in the California Supreme Court on August 17, 2011, and

22  denied on October 19, 2011 (LD 28, 29).

23        As mentioned, the one-year period commenced on January 14, 2004 and continued to run until

24  _____

25  [4] In computing the running of the statute of limitations, the day an order or judgment becomes final is excluded and time
    begins to run on the day after the judgment becomes final.  <u>See</u> <u>Patterson v. Stewart</u>, 251 F.3d 1243, 1247 (9th Cir. 2001)

26  (Citing Rule 6 of the Federal Rules of Civil Procedure).

27  [5]  Respondent's motion to dismiss lists this proceeding as a separate habeas case, although Respondent notes that in fact it
    was actually a continuation of the fourth state habeas, following remand after the fifth state habeas, and subsequent to an

28  evidentiary hearing in the Superior Court.  (Doc. 21, p. 8, n. 4).  In order to avoid confusion, the Court will adopt
    Respondent's numbering and refer to this proceeding as Petitioner's sixth habeas proceeding in state court.

Petitioner filed his first state habeas petition on July 29, 2004.  Between those two dates, 197 days of the 365 day-period expired, leaving Petitioner with only 168 days remaining on his limitation period. Respondent concedes that Petitioner is entitled to tolling during the pendency of that first petition, a period of 57 days.  (Doc. 21, p. 11).  However, Respondent argues that Petitioner is not entitled to interval tolling for the period following the denial of that first petition until the filing of the second petition because Petitioner was not proceeding "up the ladder."  (Id.). The Court agrees.

Under the AEDPA, there is no statutory tolling for the period between sets or "rounds" of state habeas petitions.  Biggs v. Duncan, 339 F.3d 1045 (9th Cir. 2003)(no tolling once California Supreme Court denied review); see also Smith v. Duncan, 297 F.3d 809 (9th Cir. 2002)(no tolling during gap between first set of state petitions and second).  In Delhomme v. Ramirez, 340 F.3d 817, 820 (9th Cir. 2003), the Ninth Circuit held that a petitioner begins a separate round of review "each time [he] files a new habeas petition *at the same or a lower level*" of the state court system.  See also Nino, 183 F.3d at 1006-1007 (intervals tolled between state court's disposition of a state habeas petition and the filing of "a petition at the next state appellate level.")(emphasis supplied).  Accordingly, since Petitioner's second petition was filed in the *same* court as the first petition, i.e., the Tulare County Superior Court, he was not proceeding "up the ladder" and, thus, the second petition is considered to have triggered a new round of habeas proceedings; hence, Petitioner is not entitled to tolling during that interval of twelve days before the second state petition was filed. Deducting those twelve days from the 168 days remaining to Petitioner left him with only 156 days within which to file his federal petition in a timely manner.

Respondent concedes that Petitioner is entitled to statutory tolling for the period starting with the filing of the second petition through the denial of the sixth state petition.  (Doc. 21, p. 12). However, after the denial of his sixth petition on April 5, 2007, Petitioner waited until May 7, 2008, a period of 397 days--or 32 days longer than the original 365-day limitation period--to file his seventh state action. Respondent correctly argues that Petitioner is not entitled to interval tolling during this 397-day period because Petitioner was not proceeding up the latter and also because the delay between the sixth and seventh petitions was not reasonable.  (Doc. 21, p. 13).  The Court agrees.

As mentioned above, statutory tolling is inapplicable to periods between successive petitions--

7

such as Petitioner's sixth and seventh state petitions--that do not form part of a progressive series from the Superior Court, to the Court of Appeal, to the California Supreme Court.  See Dils v. Small, 260 F.3d 984 (9th Circ. 2001)(statute of limitation not tolled during interval between successive state habeas petitions filed to the state's highest court); see also Nino, 183 F.3d at 1006-1007 (intervals tolled between state court's disposition of a state habeas petition and the filing of "a petition at the next state appellate level."); Saffold v. Newland, 250 F.3d 1262 (9th Circ. 2000).

Moreover, the 397-day delay was unreasonable.  In reviewing habeas petitions originating from California, the Ninth Circuit formerly employed a rule that where the California courts did not explicitly dismiss for lack of timeliness, the petition was presumed timely and was deemed "pending." In Evans v. Chavis, 549 U.S.189 (2006), the Supreme Court rejected this approach, requiring instead that the lower federal courts determine whether a state habeas petition was filed within a reasonable period of time. 549 U.S. at 198 ("That is to say, without using a merits determination as an 'absolute bellwether' (as to timeliness), the federal court must decide whether the filing of the request for state court appellate review (in state collateral review proceedings) was made within what California would consider a 'reasonable time.'").  However, "'[w]hen a post-conviction petition is untimely under state law, that [is] the end of the matter for purposes of § 2244(d)(2).'" Bonner v. Carey, 425 F.3d 1145, 1148 (9th Cir. 2005)(quoting Pace v. DiGuglielmo, 544 U.S. 408, 414 (2005)).  See also Carey v. Saffold, 536 U.S. at 226.

Therefore, under the analysis mandated by the Supreme Court's decisions in Pace and Evans, this Court must first determine whether the state court denied Petitioner's habeas application(s) as untimely.  If it was untimely, that is the end of the matter for purposes of statutory tolling because the petition would not have been properly filed.  This applies both to the period of pendency of the petition itself or for the interval between that petition and the denial of the previous petition.  Bonner, 425 F.3d at 1148-1149.

However, where, as here, the state court did not expressly deny the petition as untimely, i.e., Petitioner's seventh petition, this Court is charged with the duty of independently determining whether Petitioner's request for state court collateral review were filed within what California would consider a "reasonable time."  Evans, 546 U.S. at 198.  If so, then the state petition was properly filed and

8

1    Petitioner is entitled to interval tolling.[1]   After making an independent determination, the Court finds

2    the sixth petition was not timely filed.

3           In Evans, the Supreme Court found that a six-month delay in filing a petition was

4    unreasonable.  Id.  The Supreme Court, recognizing that California did not have strict time deadlines

5    for the filing of a habeas petition at the next appellate level, nevertheless indicated that most states

6    provide for a shorter period of 30 to 60 days within which to timely file a petition at the next appellate

7    level.  Evans, 546 U.S. at 201.  After Evans, however, it was left to the federal district courts in

8    California to carry out the Supreme Court's mandate of determining, in appropriate cases, whether the

9    petitioners' delays in filing state petitions were reasonable.  Understandably, given the uncertain scope

10   of California's "reasonable time" standard, the cases have not been entirely consistent.  However,

11   among the Ninth Circuit as well as the various federal district courts in California, a consensus has

12   emerged that any delay of sixty days or less is per se reasonable, but that any delay "substantially"

13   longer than sixty days is not reasonable.  Compare Stancle v. Clay, ___F.3d___, 2012 WL 3667315 *7

14   (9th Cir. 2012)(82 day delay unreasonable); Velasquez v. Kirkland, 629 F.3d 964, 968 (9th Cir.

15   2012)(delays of 81 and 91 days unreasonable); Chaffer v. Prosper, 592 F.3d 1046, 1048 (9th Cir.

16   2010)(delays of 115 and 101 days unreasonable); Banjo v. Ayers, 614 F.3d 964, 970 (9th Cir.

17   2010)(delay of 146 days unreasonable); Bennett v. Felker, 635 F. Supp. 2d 1122, 1126-1127 (C.D.

18   Cal. 2009)(93 days unreasonable); Culver v. Director of Corrections, 450 F.Supp.2d 1135, 1140-1141

19   (C.D. Cal. 2006)(delays of 97 and 71 days unreasonable); Forrister v. Woodford, 2007 WL 809991,

20   *2-3 (E.D. Cal. 2007)(88 day delay unreasonable); Hunt v. Felker, 2008 WL 364995 (E.D. Cal.

21   2008)(70 day delay unreasonable); Swain v. Small, 2009 WL 111573 (C.D.Cal. Jan. 12, 2009)(89 day

22   delay unreasonable); Livermore v. Watson, 556 F.Supp. 2d 1112, 1117 (E.D.Cal. 2008)(78 day delay

23   unreasonable; Bridges v. Runnels, 2007 WL 2695177 *2 (E.D.Cal. Sept. 11, 2007)(76 day delay

24   unreasonable), with Reddick v. Felker, 2008 WL 4754812 *3 (E.D.Cal. Oct. 29, 2008)(64 day delay

25

26   ─────────────────────

27   [6] Neither the Ninth Circuit nor the United States Supreme Court has addressed whether a delay in filing may deprive a
     petitioner of statutory tolling for the pendency of an otherwise properly filed state petition itself when the state court does
28   not expressly indicate that the petition was untimely. Presently, Evans only affects entitlement to interval tolling.

not "substantially" greater than sixty days); <u>Payne v. Davis</u>, 2008 WL 941969 *4 (N.D.Cal. Mar. 31, 2008 (63-day delay "well within the 'reasonable' delay of thirty to sixty days in <u>Evans</u>").

Moreover, even when the delay "significantly" exceeds sixty days, some courts have found the delay reasonable when the subsequent petition is substantially rewritten.  <u>E.g.</u>,  <u>Osumi v. Giurbino</u>, 445 F.Supp.2d 1152, 1158-1159 (C.D.Cal. 2006)(3-month delay not unreasonable given lengthy appellate briefs and petitioner's substantial re-writing of habeas petition following denial by superior court); <u>Stowers v. Evans</u>, 2006 WL 829140 (E.D.Cal. 2006)(87-day delay not unreasonable because second petition was substantially re-written); <u>Warburton v. Walker</u>, 548 F.Supp.2d 835, 840 (C.D. Cal. 2008)(69-day delay reasonable because petitioner amended petition before filing in Court of Appeal).

Here, as mentioned, the delay was 397 days, a length of time that exceeds even the original limitation period by 32 days.  The cases are clear and unanimous in holding that such a lengthy delay is unreasonable and precludes interval tolling.  Accordingly, Petitioner cannot avail himself of statutory tolling between the denial of the sixth petition on April 5, 2007, and the filing of the seventh petition on May 7, 2008.  Thus, the one-year period resumed on April 6, 2007, and expired 156 days later, i.e., on September 9, 2007.

Although Petitioner thereafter filed his seventh through thirteenth collateral proceedings in state court, none of those later-filed proceedings are entitled to statutory tolling because the one-year period had expired prior to their commencement.  <u>Green v. White</u>, 223 F.3d 1001, 1003 (9th Cir. 2000); <u>Jiminez v. Rice</u>, 276 F.3d 478 (9th Cir. 2001);  <u>see</u> <u>Webster v. Moore</u>, 199 F.3d 1256, 1259 (11th Cir. 2000)(same); <u>Ferguson v. Palmateer</u>, 321 F.3d 820 (9th Cir. 2003)("section 2244(d) does not permit the re-initiation of the limitations period that has ended before the state petition was filed."); <u>Jackson v. Dormire</u>, 180 F.3d 919, 920 (8th Cir. 1999) (petitioner fails to exhaust claims raised in state habeas corpus filed after expiration of the one-year limitations period).   Accordingly, the one-year period terminated on September 9, 2007.  As mentioned, the instant petition was not filed until February 22, 2012, approximately four years and five months after the limitation period ended.  Thus, unless Petitioner is entitled to equitable tolling that would account for this gap, the petitioner is untimely and should be dismissed.

///

10

D.   Equitable Tolling.

The running of the one-year limitation period under 28 U.S.C. § 2244(d) is subject to equitable tolling in appropriate cases. See Holland v. Florida, __U.S.__, 130 S.Ct. 2549, 2561 (2010); Calderon v. United States Dist. Ct., 128 F.3d 1283, 1289 (9th Cir. 1997).  The limitation period is subject to equitable tolling when "extraordinary circumstances beyond a prisoner's control make it impossible to file the petition on time."  Shannon v. Newland, 410 F. 3d 1083, 1089-1090 (9th Cir. 2005)(internal quotation marks and citations omitted).  "When external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of limitations may be appropriate."  Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999).  "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Holland, 130 S.Ct. at 2652; Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S. Ct. 1807 (2005). "[T]he threshold necessary to trigger equitable tolling under AEDPA is very high, lest the exceptions swallow the rule."  Miranda v. Castro, 292 F. 3d 1062, 1066 (9th Cir. 2002)(citation omitted).  As a consequence, "equitable tolling is unavailable in most cases."  Miles, 187 F. 3d at 1107.

Here, Petitioner argues primarily that he is actually innocent and, thus, entitled to equitable tolling.  Petitioner also contends that a variety of circumstances, e.g., inability to locate old state criminal records and incompetence of previous counsel, coupled with current counsel's record of diligence, should entitle Petitioner to equitable tolling.  Respondent argues vehemently that Petitioner is not entitled to equitable tolling for any of the above-mentioned reasons.  For the reasons discussed below, the Court agrees with Respondent that an entitlement to equitable tolling has not been established by Petitioner.

1.   Actual Innocence.

Regarding Petitioner's contention that he is actually innocent, the Ninth Circuit has held that "a credible claim of actual innocence constitutes an equitable exception to AEDPA's limitations period, and a petitioner who makes such a showing may pass through the Schlup gateway[5] and have his

---

[7] Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851 (1995).

1   otherwise time-barred claims heard on the merits." Lee v. Lampert, 653 F.3d 929, 932-933 (9th Cir.

2   2011)(*en banc*).   The "Schlup gateway" of "actual innocence" was articulated by the United States

3   Supreme Court as requiring a petitioner to demonstrate that, in light of the evidence, *no reasonable*

4   *juror* would have found him guilty.  Schlup, 513 U.S. at 329.  It may only be employed when a

5   petitioner "falls within the narrow class of cases…implicating a fundamental miscarriage of justice.

6   Id., 513 U.S. at 314-315.  However, "[t]o ensure that the fundamental miscarriage of justice exception

7   would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time

8   ensuring that the exception would extend relief to those who were truly deserving," the Supreme Court

9   explicitly limited the equitable exception to cases where a petitioner has made a showing of innocence.

10  Schlup, 513 U.S. at 321.  "[A]ctual innocence means factual innocence, not mere legal insufficiency."

11  Bousley v. United States, 523 U.S. 614, 623, 118 S.Ct. 1604 (1998).

12          As always, it is the petitioner's burden to produce sufficient proof of actual innocence to bring

13  him within the narrow class of cases implicating a fundamental miscarriage of justice.  Lee, 653 F.3d

14  at 937.  In the context of equitable tolling, a credible claim of actual innocence "requires a petitioner to

15  support his allegations of constitutional error with *new reliable evidence* that was not presented at

16  trial." Lee, 653 F.3d at 938 (emphasis supplied).  Then, considering all of the evidence, whether it be

17  exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. "the

18  court makes a probabilistic determination" about whether every juror, properly instructed, would have

19  reasonable doubt in light of the new evidence.  Id.  Put another way, Petitioner must demonstrate "that

20  it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable

21  doubt." Id. at 937.

22          However, unlike a sufficiency of the evidence argument under Jackson v. Virginia, 443 U.S.

23  307, 99 S.Ct. (1979), in determining actual innocence, the credibility of witnesses may need to be

24  assessed and the mere existence of sufficient evidence to convict is not determinative.  Id. at 938 n. 13.

25  Instead, a federal court must assess how reasonable jurors would react to the overall, newly

26  supplemented record.  Id.  Nevertheless, the Lee court noted that "[t]he Supreme Court did not hold

27  that a petitioner may invoke Schlup whenever he wants a trial do-over." Lee, 653 F.3d at 946

28

1    (Kozinski, J., concurring.)[6]

2        Petitioner's claim of actual innocence is based on the purportedly "new" evidence in the form

3    of a declaration by Robert Simmons who recants his trial testimony implicating Petitioner.  In the

4    recantation, Simmons confesses that he manufactured the billy club and that Petitioner only held the

5    object momentarily while Simmons wound tape around one end.  (Doc. 1, pp. 8; 33; 60).  Thus,

6    Petitioner asks this Court to entertain his untimely petition based on his contention that this "new

7    evidence" establishes that he is factually innocent.  The Court does not agree.

8        In order to place Petitioner's detailed contentions regarding innocence into a proper

9    perspective, the Court will adopt the Findings of Fact of the 5th DCA in its unpublished July 25, 2003

10   opinion affirming Petitioner's conviction and sentence:

11       On November 8, 1996, appellant was staying at the Virginia Motor Lodge on South K Street in
         the City of Tulare. That morning, appellant and a companion began walking in a southerly
12       direction along the outside of a fence. The fence was composed of upended pieces of
         corrugated sheet metal and bordered the western edge of the motel back parking lot. That
13       portion of the fence was about six feet tall or higher and was located approximately 95 feet
         from the rear of the motel building. The fence also bordered the north and south edges of the
14       motel property. At the southwest corner of the motel lot, a 19¼-inch opening in the fence
         allowed passage to and from the rear lot of the motel. The fence continued south along the
15       western edge of the lot adjoining the motel lot.

16       At 9:45 a.m. on November 8, Police Officer Frank Furtaw was on patrol duty on South K
17       Street in the City of Tulare. Furtaw pulled onto the road behind the motels on South K and saw
         the two men walking southbound along the Southern Pacific Railroad. He thought he
18       recognized one of the men as Robert Simmons, a convicted felon and parolee. Furtaw passed
         to the west of the two men and definitely recognized Simmons. At that time, appellant and
19       Simmons were about 30 feet from the opening in the fence and to the west and slightly north of
         the opening. Furtaw continued at a slow rate of speed about 30 yards beyond the two men,
20       made a U-turn to the left, and observed appellant walk toward the opening in the fence. Furtaw
         drove north toward Simmons and stopped next to him. Simmons was on the passenger side of
21       the vehicle, between the vehicle and the fence. The fence was approximately 30 feet away and
22       Simmons was positioned to the north of the fence opening.

23       Furtaw spoke briefly to Simmons as he became suspicious after appellant walked away
24       quickly. Simmons said he did not know anything about appellant or why appellant walked
25       through the fence opening. Between 10 and 15 seconds after he starting talking to Simmons,
26       Furtaw heard a loud bang against the corrugated fence. Furtaw got out of his patrol vehicle and

27
     _____
28   [8] The court in Lee expressly declined to decide what level, if any, of diligence is required for one raising the equitable
     exception of actual innocence.  Lee, 653 F.3d at 934 n. 9.

                                                       13

walked through the opening in the fence. As he passed through the opening, Furtaw saw appellant about 15 feet away. Appellant was walking toward the officer at a fast pace and he said, "I didn't know you wanted to talk to me." Appellant appeared calm when he approached the officer. Furtaw looked around the area near the motel side of the fence looking for what could have made the banging sound and saw a black cylindrical object in the grass. The object was covered with black tape and was located several feet to the north of the opening and near the fence.

Furtaw picked up the object and determined it was a taped 10-inch, galvanized metal pipe with a cap on each end. Furtaw removed the tape from one end of the pipe, took off the cap, and noticed the pipe contained dirt. The surrounding grass was wet with condensation but the pipe itself was dry. Furtaw did not notice any marks on the tape inconsistent with the pipe hitting the fence. Furtaw asked appellant if the pipe belonged to him and appellant denied that it was his. Furtaw had never seen appellant in possession of the pipe and did not observe any unusual bulges on appellant's person prior to making contact with him. Simmons said he observed appellant making the pipe in his motel room approximately three days earlier. According to Simmons, the motel room door was open at the time. Appellant filled the galvanized pipe with dirt, screwed on the end caps, and wrapped the pipe with electrical tape. Simmons said appellant made the pipe for his protection because he was having problems in the area. Simmons also told Furtaw he had heard the loud thump against the metal fence.

Furtaw arrested appellant for unlawful possession of a billy club (§ 12020, subd. (a)). David DePartee, a latent fingerprint analyst with the California Department of Justice Regional Crime Laboratory in Fresno, testified he examined the pipe and the electrical tape on the pipe for usable latent prints. DePartee did not find any usable prints on the pipe but did find one usable print on the adhesive side of the electrical tape. DePartee explained the print was initially placed on the non-adhesive side of the tape and was "picked up" by the adhesive side when another layer of tape went around the pipe. DePartee compared the latent print with appellant's fingerprint card and determined the latent print was made by appellant's left index finger. DePartee detected a second latent print on the tape. The print reflected a whorl pattern with two relatively clear ridge characteristics but DePartee said this information was insufficient for a reasonable fingerprint comparison. On cross-examination, DePartee acknowledged the presence of appellant's fingerprint on the inside of the adhesive did not identify who possessed the pipe on November 8, 1996.

Joseph Brown, a Tulare County resident, testified he visited appellant at the Agri Center Motel in Tulare in June 1990. Brown described the motel as an establishment that rented rooms by the week or month. Brown went to appellant's room and saw a "billy club" in the nightstand. Brown described the club as a 10-inch piece of one-half inch diameter galvanized pipe covered with "spongy bicycle grips on both ends." Brown said there appeared not to be anything inside the pipe at the time he found it. He kept the pipe and it was admitted into evidence at appellant's trial. However, Brown had no personal knowledge as to who owned the pipe.

Defense

At the time of trial, Robert Simmons was serving a civil commitment at Atascadero State Hospital as a sexually violent predator. He had sustained one felony conviction for sodomy and three felony convictions for lewd and lascivious conduct with a child under the age of 14 years.

14

However, he had not sustained any convictions or parole violations for possession of a billy club and did not carry weapons. Simmons acknowledged he was a candidate for punishment under the three strikes law in the event he sustained another felony conviction.

In November 1996, Simmons was living at the Virginia Lodge Motel on South K Street in Tulare. Simmons had previously testified that he had seen appellant with a pipe similar to the one Officer Furtaw found behind the fence. Simmons had also testified he watched appellant construct the pipe. Simmons did not see appellant with the pipe in November, but did say that appellant was wearing a jacket with hidden pockets. In a prior proceeding, Simmons testified that Furtaw did not make a U-turn before contacting him. Simmons did say he heard a bang on the other side of the metal fence when he was talking to Furtaw.

Jeff Blagg, a former defense investigator, interviewed Simmons on February 18, 1997. Simmons told Blagg he did not hang around with people who carried weapons or drugs because they could be stopped by police and lead to a violation of his parole. Simmons told Blagg he heard Furtaw tell appellant to walk back to the fence. Simmons said he heard a loud noise when something hit the fence. He also told Blagg he had watched appellant construct the pipe, filling it with dirt and wrapping it with black electrical tape.

Karen Sue Lee lived at the Virginia Motor Lodge in 1996 and 1997. Lee said she opened her door one morning and found appellant holding a 14- or 15-inch pipe in his hand. The pipe had the diameter of an egg and both ends were taped. She spoke to defense investigator Scott Dinkins and described the object as a "pipe bomb looking thing." She also told Dinkins the object was between 10 and 12 inches long and between one and two inches around. Lee also said she had seen the object the day before appellant's arrest. Lee told Dinkins that Simmons said the pipe was his and he lied to police about it because Simmons did not want "to do the time." At the third trial, Lee denied making these statements to Dinkins.

Sonya M. was a 16-year-old ward of the California Youth Authority at the time of the third trial. She knew Simmons in 1996 and 1997 when she was 11 years old and living at the Virginia Motor Lodge. Sonya said Simmons "play[ed] with himself" in front of her on one occasion and would give her marijuana. On one occasion, she saw a 10-inch pipe wrapped with electrical tape in Simmons's room. On another occasion, she saw him carrying the pipe on the handlebars of his bike. Simmons testified he did not own a bike until March 1997. Sonya admitted the use of marijuana and methamphetamine when she was 11 years old. At one point, she and Janica M. ran away from the Virginia Motor Lodge and went to live with Dina Burch in a neighboring trailer park.

Sonya said appellant's sister, Donna Bertao, was coming to her old neighborhood prior to the third trial to buy things for the children there. Dina Burch asked Sonya and Janica to testify at the trial. Sonya also said Burch's children had been offered money or clothes for testifying in court. The money went directly to Burch, who used some of it to buy Slushees for Sonya and Janica. Mrs. Bertao gave all of the children, including Sonya and Janica, tickets to the fair. She also bought schoolbooks and gift certificates to Mervyn's. Bertao offered to pay for medication for Dina Burch's sick granddaughter. On one occasion, a defense investigator was interviewing Sonya with Janica and the investigator offered Janica money for her jacket. Another investigator bought Sonya lunch.

15

Janica M. was 19 years old at the time of third trial. She had been living with her mother at the Virginia Motor Lodge until she and Sonya ran away to live with Dina Burch at the trailer park. Janica was using marijuana and methamphetamine at the time she ran away. She met Robert Simmons in December 1996 or January 1997 and visited his motel room four or five times with Sonya. Simmons gave them marijuana and tried to engage Sonya in a sexually explicit conversation. Although Simmons's room was dark, Janica was able to see a black object that was 10-12 inches long. Janica used to see Simmons carry the object on the handlebars of his bicycle. Janica could not say for sure whether the object was a pipe and could not recall whether it was wrapped in tape. She described the object as black with a "nipple" on each end. Janica said the object was similar to a bike pump and could have been a bike pump, but she could not see that well in those days.

Janica said she had never seen appellant's sister, Donna Bertao, but understood that she might receive tickets to the fair for testifying. Janica also anticipated she would receive money or clothing before testifying at the September 1997, proceeding. Before her testimony, Janica had a pizza lunch with Sonya, Dina Burch, and defense investigator Scott Dinkins. Janica did not borrow money from Dinkins but did sell her jacket for $10-$15 to him. Janica admitted using the money to buy street drugs.

In a prior proceeding, Dina Burch said she had seen Simmons in possession of 9-10-inch black pipe on about 10 occasions. Simmons was on foot on three of those occasions and was riding his bicycle on the remaining occasions. She described the pipe as a miniature "cops club." She said the pipe was smaller than a flashlight but heavy and crudely-made. After her testimony in September 1997, Dina Burch told Karen Lee that appellant's family had given her some money.

Appellant's older sister, Donna Bertao, testified appellant traveled from Clovis to Tulare on Friday, November 1, 1996, and rented a room at the Virginia Motor Lodge. Mrs. Bertao said she and her husband, Joseph, had suffered a family tragedy and appellant came to Tulare to support them. The next morning he went to Mrs. Bertao's place of business and spent the entire day with her. At about 9:00 p.m., Donna took appellant back to his room at the Virginia Motor Lodge. The following day, Sunday, November 3, Joe Bertao picked up appellant at the motel at about 9:00 a.m. and took him back to the family business. At about 9:00 p.m., Donna drove appellant back to the motel. Appellant was with Mrs. Bertao from 11:00 a.m. to 8:00 p.m. on November 4.

On the morning of Tuesday, November 5, 1996, Joe Bertao picked appellant up at the motel and appellant spent the day with the Bertaos. Donna had an inoperable radio at her place of business. Appellant asked Donna if he could borrow the radio to repair it. He also borrowed a screwdriver, wrench, and a roll of black electrical tape. Donna took appellant back to the motel at about 9:00 p.m. that day. On Wednesday, November 6, appellant arrived at Donna's store in the middle of the morning and she took him back to the Virginia Motor Lodge at about 9:00 p.m.

On Thursday, November 7, 1996, Joseph and Donna took a new J.C. Penney jacket to appellant at his motel. The Bertaos had purchased the jacket on November 4, because the

16

weather was getting cooler and appellant needed a heavier garment. On the evening of November 7, the Bertaos noticed the broken radio was now working. Appellant showed Joe where he had repaired a short with the black electrical tape. The Bertaos had planned a one-week trip to Los Angeles beginning November 8. Joe Bertao said they were accompanying their son to the National Future Farmers of America Convention where the younger Bertao was to receive his American Farmer degree. Donna said appellant intended to join them at their home upon their return from the trip. When the Bertaos returned from the trip, they went through their accumulated mail and found a letter from appellant. In that letter, appellant stated he had been placed under arrest. The Bertaos bailed him out of jail and noticed a snag on the right shoulder of the new jacket. Joe Bertao said the snag was at about the same level as three nails on a pole near the opening of the corrugated metal fence behind appellant's motel. The Bertaos never noticed anything suspicious in appellant's room at the Virginia Motor Lodge and never noticed Robert Simmons on the premises.

Donna Bertao said appellant was disabled with rheumatoid arthritis. He shuffled in the mornings and could not rotate his neck because it was surgically fused. Charles H. Boniske, M.D., appellant's treating rheumatologist, said appellant had suffered from joint and knee problems for 18 years. Dr. Boniske said appellant suffered from asymmetric polyarthritis and described it in his testimony:

> "It's an inflammatory arthritis that Mr. Davis has. He has inflammation in his joints. They get swollen. He develops limited range of motion in several joints. His knees, specifically, were inflamed and basically were gushy, swollen."

Dr. Boniske said the 44-year-old appellant had limited flexion, or rotation, of his neck and had a large spur that limited his motion in the mid-cervical spine. Boniske described appellant's condition as degenerative and said the inflammatory nature of his arthritis meant he had a lot of stiffness in the morning hours.

Donna Bertao denied giving anything to Dina Burch, Sonya M., or Janica M. to procure their testimony. In July 1997, Dina Burch's husband, Jimmy, approached Donna and Joe at the Virginia Motor Lodge. The Bertaos gave Jimmy Burch the name and address of appellant's counsel as well as their own names and address. Toward the end of July 1997, Dina called Donna, explained she was raising her three grandchildren, and asked to borrow money for food. Defense investigator Scott Dinkins allowed Donna to take Dina about $40 worth of groceries. However, Donna did not give money to the Burches.

Dina Burch called Donna two or three weeks later and asked if the Bertaos had a garden and could spare any vegetables for the grandchildren. Dinkins again allowed Donna to give Dina some groceries. In addition, Donna gave $20 to Dinkins to buy lunch for the four defense witnesses during trial. The Bertaos purchased three County Fair wrist bands for the Burch children at a cost of $12 each. Donna did not intend that those wrist bands be given to Sonya M. or Janica M. In December 1997, the Bertaos "adopted" Dina Burch's family and another low-income family and provided them with Christmas trees and age-appropriate toys. Dina said each tree cost approximately $15 and the toys came from K-Mart or Wal-Mart.

17

In the beginning of 1998, Dina called Donna because one of her grandchildren was sick and she did not have money to pay for prescription medication. Donna called the pharmacy and paid for the medicine with her credit card. Donna said she was a volunteer with the Big Brothers/Big Sisters program. In the summer of 1998, she encouraged Dina's two older grandchildren to apply for a special program through Mervyn's Stores. The program was designed for low-income children and provided each one with a $100 clothing shopping spree and a backpack full of school supplies. Donna said she gave Dina's grandchildren the application forms but had no control over whether they qualified for the program. Donna also said she did not supply the money for their sprees. However, upon request of the Big Brothers/Big Sisters director, Donna did transport Dina's older grandchildren to Mervyn's to participate in the sprees.

Dennis Rhyman, Donna's cousin and a retired Visalia Police Officer, testified the Bertaos worked with needy families throughout the year and had a reputation in their community for being honest.

Rebuttal

Ralph Edwards, an investigator for the Tulare County District Attorney's Office, interviewed Sonya M. prior to her testimony at the third trial. According to Edwards, Sonya believed she was going to receive something in exchange for her testimony. Sonya said Dina Burch received and kept most of the money. She specifically recalled Donna Bertao giving $20 to Dina Burch. When Edwards interviewed Dina Burch, she said no one had given her any money, presents, or other items in exchange for her testimony.

People v. Davis, 2003 WL 21728864 (July 25, 2003 Cal.App.), *4-10.

Simmons' recantation of his trial testimony falls far short of the Schlup threshold. First, the "evidence" is not newly discovered. As Respondent correctly observes, Simmons told Petitioner's trial attorney that he was lying in an interview that occurred on December 19, 2003, while Petitioner's case was still on direct appeal. (Doc. 1, p. 52). At that critical point before his direct appeal became final, Petitioner could have chosen to initiate a variety of state legal remedies to place Simmons' recantation before the state court. He did not do this, but instead waited years before he actually began to seek relief in the state courts.

Second, even if this evidence was "newly discovered," it falls far short of Schlup's exacting standard that Petitioner demonstrate that, in light of the evidence, *no reasonable juror would have found him guilty.* Schlup, 513 U.S. at 329. First, as the superior court noted in denying Petitioner's fourth and eighth state petitions, Petitioner's fingerprint was found on the adhesive inside the wrapped tape, a location that strongly suggests that Petitioner participated in the wrapping of the club itself. Second, Petitioner was observed by Officer Furtaw in the presence of Simmons at the time of the offense and was observed walking quickly away from Simmons and through a corrugated metal fence

18

when Furtaw swung his patrol car around to contact Simmons.  While talking to Simmons, Furtaw heard a loud bang against the fence and, when he investigated, found Petitioner walking toward him and saw the billyclub in the grass near the fence, on the same side of the fence where Furtaw contacted Petitioner.

Simmons' testimony that he had never owned the object was impeached by three trial witnesses each of whom testified that they had seen Simmons with the object.  Thus, the jury considered Simmons' credibility at trial when it considered the weight to be given to his testimony inculpating Petitioner.  However, given the location of Petitioner's fingerprint, the location of the club when Furtaw confronted Petitioner and Simmons, and Petitioner's own suspicious behavior when Furtaw approached the two men, this evidence and reasonable inferences therefrom, was sufficient to support a reasonable juror's decision that Petitioner, not Simmons, possessed the club when Furtaw first made contact with them.[7]

Simmons' extensive credibility issues, on full display for the jury at the third trial, cut both ways.  On one hand, the testimony of the three witnesses who said they saw Simmons with the weapon on various occasions contradicts Simmons' trial testimony to the contrary, favoring Petitioner's innocence.  On the other hand, the fact that Simmons has changed his story so many times makes yet another change of tune in a recantation far less compelling and credible as well, favoring Petitioner's guilt.  Moreover, it bears emphasis that the witnesses impeaching Simmons credibility *themselves* were impeached with evidence that they received gifts from Petitioner's sister as an inducement to testify against Simmons.  Given this thicket of lies, innuendoes, and contradictions, reasonable jurors could have believed Simmons *or* his impugners, *or* the jury could simply have discounted the testimony of all of those witnesses as inherently unreliable.  Regardless, even without Simmons' testimony, the evidence surrounding the actual offense itself was, in the Court's estimation, sufficient to support a reasonable juror's conclusion that Petitioner was guilty beyond a reasonable doubt of possession of the weapon.  From the record now before the Court, it simply cannot conclude that <u>no</u>

---

[9] Contrary to Petitioner's contentions, the presence of the fingerprint on the tape does not go only to a charge of manufacturing the billy club.  Obviously, if Petitioner did indeed manufacture the billy club, then that fact makes it all the more likely that Petitioner, not Simmons, was the individual who was in possession of the billy club at the time Furtaw contacted the two men.

reasonable juror would have found Petitioner guilty simply because of Simmons' recantation.

Schlup's standard is rigorous and Petitioner has not met it.  From the Court's perspective, Petitioner is merely seeking what the Ninth Circuit Court of Appeals has prohibited; a "trial do-over." Lee v. Lampert, 653 F.3d at 946.

2.  Difficulty In Obtaining Transcripts And Other Court Documents.

Petitioner devotes extensive time to discussing the difficulties inherent in trying to locate state court records that, in some cases, were over twenty-five years old.  Petitioner includes countless documents, correspondence, etc., detailing his efforts to locate various documents relating to all three of Petitioner's convictions.  What is entirely lacking, however, is any direct correlation between the inability to locate and obtain the desired records and Petitioner's failure to timely file his petition. While Petitioner appears to assume that a petition could not be filed without those records, that assumption is not as obvious to this Court.

Pro se inmates almost always file their federal petitions without any supporting documentation, relying instead upon the Attorney General to provide all necessary records.  Alternatively, a pro se inmate could file a timely petition and then request a stay to obtain additional documents and/or exhaust new claims.  What petitioners generally do not do, however, is simply to wait until the documents have been obtained at some future time or until it has been determined that they have been destroyed before proceeding with a federal petition, and allowing the one-year limitation period to expire in the process.  Even a cursory review of the various documents submitted by Petitioner, which comprise approximately 800 pages of materials, strongly suggests that the factual bases of Petitioner's claims were well known to Petitioner at an early point in the proceedings and could have been incorporated, along with appropriate legal arguments, into a timely-filed petition without the need to contemporaneously submit the actual physical documents themselves.  Once the matter was before the Court in a timely manner, the Court and parties could then have determined whether the missing documents were necessary and, if so, how to obtain them or how to proceed in their absence.

In sum, it seems that Petitioner and his counsel made a strategic choice to forego filing a timely petition in order to obtain a wide variety of documents to present with the petition.  Such circumstances, by definition, are not "extraordinary circumstances *beyond the control*" of the

20

Petitioner since it was Petitioner and his counsel who made the deliberate decision whether to file a timely petition or to wait until all documents were obtained.  If equitable tolling were available every time a petitioner or his attorney had some difficulty in obtaining documents, equitable tolling would become the exception that swallows the rule.  To the contrary, it is a narrow exception and, in the Court's view, simply does not apply in this case.

3.   Ineffective Assistance of Counsel.

Claims of ineffective assistance of trial and appellate counsel are scattered throughout the two petitions.  Respondent has identified claims relating to counsel's failure to object to jury instructions, the failure to raise the instructional error on appeal, counsel's failure to request dismissal of prior strikes at sentencing, and habeas counsel's errors during the proceedings surrounding the sixth state habeas petition.  (Doc. 21, pp. 22-23).  However, the only ineffective assistance claim that relates to the issue of equitable tolling is the question whether attorney Kathy Hart, habeas counsel at the proceedings on the sixth petition, acted so egregiously in representing Petitioner that he should be awarded tolling credits against the 397-day delay between the sixth and seventh petitions.  In support of this position, Petitioner contends that, subsequent to the April 15, 2007 denial of his sixth petition, competent counsel would have pursued a habeas petition in the 5th DCA to challenge the inadequacies Petitioner believes existed in the superior court's denial of his sixth petition.  For several reasons, the Court concludes that counsel's conduct does not justify equitable tolling.

First, Petitioner's contention fails to establish that Ms. Hart's conduct fell below the standard of reasonableness required by the Sixth Amendment.  Significantly, Petitioner does not point to any specific misconduct or negligence by Ms. Hart *during* the habeas proceedings themselves.  Rather, Petitioner contends that, once the superior court issued its ruling, Ms. Hart should have recognized the errors in the superior court's reasoning and pursued the case further.  The evidentiary and factual support Petitioner supplies for such a contention, however, fall far short of what would be required to conclude that Ms. Hart's conduct was egregious.

Attorney negligence, including a miscalculation of a filing deadline, is not a sufficient basis for applying equitable tolling to the § 2244(d)(1) limitation period.  Hollanda, 130 S.Ct. 2549; Randle v. Crawford, 604 F.3d 1047, 1058 (9th Cir. 2010); Spitsyn v. Moore, 345 F.3d 796, 800 (9th Cir. 2003);

1   Frye v. Hickman, 273 F.3d 1144, 1146 (9th Cir. 2001).  Rather, only attorney misconduct that is

2   sufficiently egregious to meet the extraordinary misconduct standard can be a basis for applying

3   equitable tolling.  Spitsyn, 345 F.3d at 801.  In Spitsyn, the attorney was retained a full year in

4   advance of the deadline, but completely failed to prepare or file a petition even though the attorney

5   was repeatedly contacted by both the client and the client's mother, and a grievance was filed with the

6   state bar association complaining about the lack of response.  Also, despite a letter terminating the

7   representation and requesting the file, it was not turned over until two months after the expiration of

8   the filing deadline.  The conduct was held to be sufficiently egregious to warrant equitable tolling.  Id.

9   at 798, 801.  It was still necessary, however, that the petitioner act with reasonable diligence.  Id. at

10   802.

11   Here, Petitioner fails to establish that Ms. Hart's decision not to represent Petitioner in further

12   habeas proceedings was egregious.  Indeed, the only explanation Petitioner offers is that counsel failed

13   to fully appreciate how erroneous the superior court's denial really was.  Even if this were the case, it

14   would only amount to negligence, not egregious misconduct.  Petitioner has not provided sufficient

15   facts for the Court to conclude that counsel's representation was deficient to such a flagrant degree

16   that equitable tolling is required.  Indeed, the Court's review of the superior court's denial does not

17   reveal any deficiencies at all.

18   Second, even assuming, arguendo, that counsel's conduct in failing to pursue the case beyond

19   the superior court's ruling was egregious, Petitioner has failed to show that *her conduct alone*

20   prevented him from timely filing his federal petition.  In this regard, it is Petitioner's duty to "connect

21   the dots" between counsel's misconduct and Petitioner's own inability to timely file a petition.  See,

22   e.g., Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005); Gaston v. Palmer, 417 F.3d 1030, 1034 (9th Cir.

23   2005); Smith v. Duncan, 297 F.3d 809, 814 (9th Cir. 2002); Miranda v. Castro, 292 F.3d 1063, 1065

24   (9th Cir. 2002).  As well, a petitioner must act with diligence in order to avail himself of the doctrine of

25   equitable tolling.  See Baldwin County Welcome Center v. Brown, 466 U.S. 147, 151 (1984)(a

26   petitioner who fails to act diligently cannot invoke equitable principles to excuse his lack of diligence.)

27   Petitioner waited 397 days after the April 15, 2007 denial before filing his next petition.  Yet he has

28   provided absolutely no evidence that would suggest that it was Ms. Hart's refusal to pursue a seventh

22

1    petition that was the "but for" cause of this lengthy delay.  Obviously, it would have been easier for

2    Petitioner had Ms. Hart agreed to file the next petition.  However, once counsel demurred, Petitioner,

3    acting on his own, had ample time to proceed to the next level in a timely fashion.  His counsel's

4    reluctance to proceed, however, is simply not an extraordinary circumstance that precluded him from

5    timely filing his next petition.  Therefore, equitable tolling is not justified.

6                                  4.   Procedural Default.

7              Both parties devote extensive time in the briefs discussing whether California's timeliness bar

8    is consistently applied such that a procedural timeliness bar could preclude Petitioner's claims on their

9    merits.  Although the Court understands the impulse to rebut Petitioner's arguments on this score, the

10   entire discussion is irrelevant to the issue of the AEDPA's one-year limitation period.

11             Certainly, a state procedural bar can, in some circumstances, i.e., where the bar is clearly

12   established and consistently applied, preclude federal review on the merits.  And, just as certainly, one

13   of those state procedural bars involves timeliness of filing the state petitions.  However, the instant

14   motion to dismiss does not raise the issue of a state procedural bar; rather, it contends that the claims

15   are untimely, that claims are unexhausted, and that many claims are non-cognizable.  Nowhere does

16   Respondent contend that procedural default is a basis for precluding a merits review.

17             Indeed, at issue here is not whether Petitioner is procedurally barred under state law, but

18   whether he has failed to file his petition within the AEDPA's one-year limitation period.  Thus, any

19   discussion of a state procedural bars is outside the scope of the issues raised in the motion to dismiss.

20                                 5.   Claims Related To The 1978 Conviction.

21             Petitioner's claims challenging prior convictions are barred from federal review by

22   Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394 (2001).  In Lackawanna, the U.S. Supreme

23   Court considered whether a § 2254 habeas petitioner could collaterally attack an earlier state

24   conviction used to enhance the sentence for a later state conviction.  The Court ruled that such a

25   petitioner satisfies the "in custody" requirement if, although no longer serving the sentences imposed

26   for the first state convictions, the petitioner was serving the sentences enhanced by the first

27   convictions.  Id. at 402-403.

28

                                              23

The Court then turned to the central question of the appeal, and held that if a prior conviction is no longer open to federal review, then the defendant cannot collaterally attack the prior conviction through a § 2254 petition:

> "...[W]e hold that once a state conviction is no longer open to direct or collateral attach in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid. [Citation.] If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained."

Id. at 403-404.

The Supreme Court recognized two possible exceptions to the bar. A petitioner may seek habeas relief if: 1) he challenges an enhanced sentence on the grounds that the prior conviction used to enhance the sentence was obtained where there was a failure to appoint counsel in violation of the Sixth Amendment, or 2) a petitioner obtains compelling evidence that he is actually innocent of the crime for which he was convicted, and could not have uncovered such evidence in a timely manner. Id. at 405.

Here, any direct challenge by Petitioner to his 1978 conviction would be barred by the AEDPA's one-year statute of limitations as discussed extensively above. As mentioned previously, the AEDPA imposes various requirements on all petitions for writ of habeas corpus filed after the date of its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). Also as mentioned previously, this petition and its supplemental claims are subject to the provisions of the AEDPA.

Here, Petitioner has not indicated whether he filed a direct appeal from his prior conviction, or, if he did, when the direct appeal from that action would have concluded. Accordingly, the Court must assume either he did not appeal his guilty plea or that his conviction became final prior to the enactment of the AEDPA on April 25, 1996, a circumstance that seems virtually certain. Under such circumstances, Petitioner's one-year limitations period for habeas claims relating to those two convictions would have commenced on April 26, 1996, and would have expired one year later, i.e., on April 25, 1997, absent applicable tolling. Under those circumstances, his prior conviction does not

1    remain open to direct federal review; therefore, <u>Lackawanna</u> is applicable.  <u>Lackawanna</u>, 532 U.S. at

2    403-405. [8]

3        As the United States Supreme Court noted, "[t]hese vehicles for review...are not available

4    indefinitely and without limitation."  <u>Lackawanna</u>, 532 U.S. at 402-403.  Petitioner has waited over

5    two decades to challenge his prior convictions.  It appears Petitioner chose not to challenge those

6    earlier convictions until they became the vehicles for enhancing his current sentence from a simple

7    determinate sentence to an indeterminate life sentence.

8        Moreover, Petitioner does not allege any facts that would qualify him for an exception to the

9    <u>Lackawanna</u> bar.  Petitioner does not assert that the constitutional basis for challenging his prior

10   conviction was the state court's failure to appoint counsel, nor does he demonstrate that he is actually

11   innocent of that earlier offense.[9]  Rather, he contends that the trial court failed to follow state laws

12   regarding mental health referrals, that his counsel failed to advise him of the diagnosis arising from the

13   referral, that he was not provided the results of the referral, and that the state court erred in habeas

14   proceedings by not ordering an evidentiary hearing.  Given Petitioner's argument regarding ineffective

15   assistance of counsel, it is evident he was represented by counsel at the time of his prior conviction.

16   Further, Petitioner has never contended he is "actually innocent" of the prior conviction as that term is

17   defined by <u>Schlup</u>.  Accordingly, because Petitioner fails to qualify for any exception to the

18   <u>Lackawanna</u> bar, he is foreclosed from challenging the 1978 conviction in these proceedings.

19   ///

20

21   [8] Petitioner argues that his challenge to the 1978 conviction should be deemed timely because, at the time, he suffered
     from paranoid schizophrenia, which had been diagnosed in 1978 but about which Petitioner was entirely unaware until
22   some 14 years later. (Doc. 27, p. 56).  This contention fails for two reasons.  First, the evidence of a mental disability is
     simply too generalized to establish that "but for" that disability Petitioner would have challenged the 1978 conviction in a
23   timely manner.  Second, and perhaps more compelling, the one-year limitation period did not exist until 1996, when the
     AEDPA was signed into law; subsequently, federal courts concluded that if direct review of an inmate's appeal concluded
24   prior to the enactment date of the AEDPA, i.e., April 24, 1996, the one-year period would be deemed to have commenced
     on the following day, i.e., April 25, 1996, and would have concluded one year later, i.e., on April 25, 1997.  Here,
25   Petitioner himself acknowledges that he discovered his mental disability claim in 1992, almost five years before the
     AEDPA deadline could run, but nevertheless Petitioner did nothing to challenge that conviction until after the limitation
26   period expired.  Under no set of circumstances can such a delay be considered reasonable.
     [11] Petitioner argues that <u>Lackawanna</u> has been satisfied because he is actually innocent of the possession of a billyclub
27   charge.  (Doc. 36, p. 14).  This is a misreading of <u>Lackawanna</u>, which clearly refers to actual innocence as to the earlier
     conviction that the petition is seeking to overturn, i.e., the 1978 and 1986 convictions, not the current conviction.
28   <u>Lackawanna</u>, 532 U.S. at 405. In any event, as discussed above, the Court finds there is not evidence, according to <u>Schlup</u>,
     of actual evidence here.

6.  <u>Miscellaneous Claims Of Equitable Tolling</u>.

Petitioner cites numerous cases that he claims are dispositive and controlling as to the motion to dismiss.  However, upon closer examination, the cases actually relate to the merits of Petitioner's claims.  As mentioned, the merits of his claims are properly addressed in this motion to dismiss except on an extremely limited manner. Unlike Respondent, the Court will not devote additional time to discussing each and every of these cases.  Instead, after having read and reviewed these authorities, the Court concludes *none* of them directly address the specific timeliness issues  raised and, therefore, provide Petitioner no assistance.

As mentioned, the burden of demonstrating that the AEDPA's one-year limitation period was sufficiently tolled, whether statutorily or equitably, rests with Petitioner.  <u>See, e.g.</u>, Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005); <u>Gaston</u>, 417 F.3d at 1034; <u>Smith</u>, 297 F.3d at 814; <u>Miranda</u>, 292 F.3d at 1065.  For the reasons discussed above, the Court concludes that Petitioner has not met his burden with respect to the tolling issue.  Accordingly, the petition is untimely and should therefore be dismissed.[10]

**<u>RECOMMENDATION</u>**

Accordingly, the Court HEREBY RECOMMENDS that the motion to dismiss be **GRANTED** and the habeas corpus petition be **DISMISSED** for Petitioner's failure to comply with 28 U.S.C. § 2244(d)'s one year limitation period.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to this case, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty (20) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised

---

[10] Because the Court concludes that the petition is clearly untimely, the Court need not address Respondent's further contentions that certain claims are unexhausted and that some grounds for relief fail to state cognizable habeas claims.

that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

    Dated:   **MAY 10, 2013**                    **/s/ Jennifer L. Thurston**

                                                UNITED STATES MAGISTRATE JUDGE